699 S.E.2d 541 (2010)
DINKLER
v.
The STATE.
No. A10A0505.
Court of Appeals of Georgia.
June 25, 2010.
*542 Joseph S. Key, McDonough, for appellant.
Tommy K. Floyd, Dist. Atty., David E. Slemons, Asst. Dist. Atty., for appellee.
MIKELL, Judge.
Earl Dinkler was convicted of two counts of cruelty to children by a Henry County jury and sentenced to fifteen years, two to serve in confinement with the balance on probation.[1] On appeal, Dinkler charges that the trial court erred when it failed to charge the jury on the lesser included offense of *543 battery and when it denied his motion for directed verdict of acquittal. We affirm.
Construed in favor of the verdict, the evidence showed that early in the morning on August 4, 2007, thirteen-year-old P.D., appellant's adopted daughter, knocked on her neighbor Donna Chapman's door and asked her for water, explaining that she had been running laps. When Chapman returned to the door, P.D. was not there. Chapman testified that later that afternoon, Dinkler visited her home to give her husband some information, and while talking, appeared to be trying to look inside her house. After Dinkler left, P.D. knocked on the door again. Chapman recalled that P.D.'s clothes were dirty and sweaty, as were her hair and nails. Chapman testified that P.D. told her that she was thirsty and hungry and had been hiding under Chapman's house; that P.D. explained that she was hiding from her parents; that she watched P.D. drink several bottles of water and fed her dinner; and that P.D. told her that she was afraid to go home because her parents had hit her. Chapman called the police.
Officer James McDaniel of the McDonough Police Department testified that he responded to Chapman's 911 call and that P.D. told him that she was afraid to go home because of the spankings she received when she did not finish exercises or chores that her parents required her to do. McDaniel contacted his supervisor then visited Dinkler's home to question him. According to McDaniel, Dinkler admitted that he spanked P.D. because she had not finished her squats and that they made the children exercise because they had anger issues. Based on the initial investigation, McDaniel transported P.D. and her younger brother, J.D., to the hospital for evaluation.
Nurse Tammy Chapko of the Henry Medical Center testified that she took care of P.D. on the day in question. Chapko testified that P.D. had extensive dark bruising from her buttocks down to her thighs and whelp marks on her thighs and complained of pain in both areas. When Chapko asked how P.D. sustained the injuries, Dinkler replied that P.D.'s mother used a wooden paddle to discipline the child and that he used a belt. However, P.D. told Chapko that she was beaten because she could not finish her exercises; she was supposed to do 15 laps, and when she could not complete them, was told to do 30 laps, then told to do squats when she could not complete laps. P.D. said that her parents considered her inability to complete the exercises to be an act of disobedience.
Dr. George Aristide testified that he treated P.D. and J.D. Dr. Aristide testified that he observed extensive bruising on P.D. and that he was horrified by her injuries. Dr. Aristide also observed bruising on J.D., although it was not as severe as P.D.'s and seemed to have occurred before P.D.'s injuries because the bruises were darker and were not raised like P.D.'s. On cross-examination, Dr. Aristide stated that J.D.'s medical records indicated that he reported that the bruising on his bottom was caused by being spanked by his mother with a wooden bat a month earlier. Additionally, the records indicated that P.D. said that she had been spanked by both parents.
P.D. testified that she was fourteen years old and that she and her younger brother were from the Ukraine and were adopted by the Dinklers when she was eight years old. She further testified her mother was the primary disciplinarian; that they were required to run 15 laps every morning; that they were only allowed to have bowel movements in the morning and that buckets were placed by their beds at night in the event they had to urinate; that they were required to dump their buckets outside and to disinfect them before returning them to their bedrooms; and that the Dinklers would prevent them from going to the restroom and when they had accidents, the Dinklers forced them to wear pull ups. On the day that P.D. went to the Chapman home, she recalled that she did not want to run her laps because she was sore from being beaten with a baseball bat on her back and legs; that her parents nonetheless made her do squats and run several laps; that Dinkler beat her and her mother hit her several times with the bat that morning; and that she hid under her neighbor's porch for quite some time. P.D. identified the pictures of the bruises that she sustained and testified that the Dinklers beat *544 her and her brother regularly. P.D. stated that the Dinklers would make her and her brother pull down their pants and underwear and touch their ankles to be spanked and that they were often in the room together when they were spanked. When asked what items they were beaten with, P.D. explained that at first, they were spanked only with a belt, but as time passed, her parents also used a bamboo stick and a baseball bat to beat them. The bat was introduced into evidence. According to P.D., both parents used the belt and bat to beat the children, and the number of times each child was hit was equal to their age plus one.
When J.D. testified, he corroborated P.D.'s testimony. He testified that he got up at 5:30 every morning and was required to run 15 laps within a certain period of time; that he was hit with a belt or bat when he failed to run the laps; that he used a bucket if he had to use the restroom during the night; that he would shower and clean his bucket after running; that he would be beaten if he had a bowel movement in the bucket; that there was a working bathroom near his room; that he would use the bathroom in his pants when his parents would not let him go to the restroom and would get beaten for doing so; and that he was forced to wear princess diapers if he urinated or defecated on himself and was ridiculed by his mother for wearing them. J.D. further testified that his mother beat him with a bamboo stick and a bat, while his father used both of those items as well as a belt. J.D. said that he was hit on his bottom and his private area and was made to assume the same position as his sister to be spanked. J.D. recalled that he sustained painful bruises that were extremely visible as a result of the beatings. J.D. also identified the bat that was used to beat him and P.D.
Dinkler testified that his wife was the primary disciplinarian for the children by default because he traveled frequently for his job. Dinkler further testified that he disciplined the children by requiring them to exercise, including running laps and pushups; that he never used a bat to discipline P.D. but had used it once to discipline J.D. after he lied to his mother because lying was a serious offense in their home; that he hit J.D. on his bottom with the small end of the bat eleven times because the rule was one "swat" for each year of age plus one; that he did not lose control while spanking J.D. because he never spanked the children with the intent to injure them, only to change their behavior; that after the spanking, J.D.'s bottom was red but not bruised; and that he told his wife he did not think the bat was an appropriate discipline tool.
Dinkler testified that he only whipped P.D. with his belt and never required her to remove her underwear but did make her lift her skirt or pull down her pants before making her bend over and grab her ankles for a spanking. Dinkler admitted that he whipped P.D. on August 4, 2007, and that he did see a bruise on her right thigh during the whipping so he beat her on the upper portion of her bottom away from the bruised area. Dinkler testified that the spankings he administered to both children were reasonable disciplinary measures. He admitted on cross-examination that he sometimes saw bruising on the children's bodies but that his wife would explain that they had had rough weeks, getting two or three spankings during the week, but Dinkler maintained that these weeks were rare. Dinkler also admitted that the children were given buckets to use in their rooms at night because they had problems making it through the night without using the restroom and that he and his wife had read literature that discouraged allowing the children to wander the house at night. They had gotten the idea to use buckets from the Ukraine.
Deborah Dinkler testified that she disciplined the children 75 to 80 percent of the time; that Dinkler never caused bruising on the children but she did; that Dinkler used the belt to spank the children except for the one occasion where he used the bat and that he has used the bamboo stick on occasion; and that Dinkler did not like that she used a bat to discipline the children.
1. Dinkler argues that his convictions should be reversed because the trial court refused to give his written request to charge the jury on battery as a lesser included *545 offense of cruelty to children.[2] We agree that the charge should have been given but conclude that reversal is not required.
The complete rule with regard to giving a defendant's requested charge on a lesser included offense is: where the state's evidence establishes all of the elements of an offense and there is no evidence raising the lesser offense, there is no error in failing to give a charge on the lesser offense. Where a case contains some evidence, no matter how slight, that shows that the defendant committed a lesser offense, then the court should charge the jury on that offense.[3]
OCGA § 16-5-70(b) provides that "[a]ny person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." The crime of battery is committed when a person "[i]ntentionally causes substantial physical harm or visible bodily harm to another."[4]
Under OCGA § 16-1-6, a defendant may be convicted of an offense which is included in the crime for which he is indicted when: (1) the offense is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the crime charged; or (2) the offense differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person or a lesser kind of culpability suffices to establish its commission. The lesser offense may be an included offense in a particular case if the facts alleged in the indictment and the evidence presented at trial to establish the charged offense are sufficient to establish the lesser offense as well. Thus, whether a lesser offense is included in a greater offense as a matter of fact must be determined on a case-by-case basis, depending upon the facts alleged in the indictment and the evidence presented at trial.[5]
In this case, the indictment charged Dinkler with two counts of cruelty to children in the first degree, alleging that he "unlawfully and maliciously caused [P.D.] [and J.D., in the second count], a child under the age of 18 years, cruel and excessive physical and mental pain by striking said child about the body with a belt and wooden bat." Because the evidence here authorized a finding that Dinkler intentionally caused substantial physical harm and visible bodily harm to the children by beating them with a bat and a belt, the trial court should have given the requested charge on battery.[6] However, "[r]eversal is *546 not required . . . if it is highly probable that the failure to give a charge on a lesser included offense did not contribute to the verdict."[7] In light of the overwhelming evidence of the commission of the greater offense, we conclude that the failure to give the battery charge was harmless error.[8]
2. In his second enumeration of error, Dinkler contends that his motion for directed verdict of acquittal should have been granted because the state failed to prove venue and that Dinkler used a bat and a belt as stated in the indictment. We disagree.
(a) Venue. In reviewing the sufficiency of the evidence to support venue, we view the evidence in the light most favorable to support the jury's verdict and determine whether, based on the evidence presented, a rational trier of fact could have found the essential element of venue beyond a reasonable doubt.[9] J.D. testified that he and his sister lived in McDonough, about three blocks from the courthouse in which the trial was held. Dinkler testified that he had been living in the same home in McDonough for 14 years and that he and his wife had attempted to adopt "here," which he described as Henry County. Donna Chapman, Dinkler's next door neighbor, also testified that she lived in Henry County. Thus, venue was properly established by the state.
(b) Indictment. We also reject Dinkler's argument that he was entitled to a motion for directed verdict because the state failed to prove that he used a bat and a belt as stated in the indictment. Both J.D. and P.D. testified that Dinkler beat them with a belt and a bat and that the beatings occurred when they did not complete the exercises that they were required to do on a daily basis. Accordingly, this enumerated error fails as well.
Judgment affirmed.
SMITH, P.J., and ADAMS, J., concur.
NOTES
[1] Dinkler was jointly indicted with his wife, Deborah Dinkler. Deborah pled guilty to cruelty to children in exchange for a lesser sentence.
[2] The trial court relied on Drinkard v. Walker, 281 Ga. 211, 636 S.E.2d 530 (2006), in deciding that the charge on battery was not required, reasoning that because the offenses of cruelty to children and battery had different elements, the charge was not warranted. But as was recently explained by our Supreme Court in Stepp v. State, 286 Ga. 556, 557, 690 S.E.2d 161 (2010), the Court's adoption of the "required evidence" test "applies strictly within the context of determining whether multiple convictions are precluded because one of the crimes was `established by proof of the same or less than all the facts' that were required to establish the other crime under OCGA § 16-1-6(1)." As this case does not involve multiple convictions, Drinkard is not controlling.
[3] (Citation omitted; emphasis in original.) Edwards v. State, 264 Ga. 131, 133, 442 S.E.2d 444 (1994).
[4] OCGA § 16-5-23.1(a). "[T]he term `visible bodily harm' means bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts, or substantial bruises to body parts." OCGA § 16-5-23.1(b).
[5] (Citations and punctuation omitted.) Bennett v. State, 244 Ga.App. 149, 151(2), 534 S.E.2d 881 (2000).
[6] In cases where the appellate courts have held that such a charge was not authorized, the defendant either denied the commission of the offenses or argued that the injuries sustained by the children were accidentally caused. See id. (defendant alleged he was playing with child, albeit strenuously, and that the injuries resulted from an accidental fall); Smith v. State, 261 Ga.App. 106, 109(2), 581 S.E.2d 713 (2003) (defendant denied striking child and testified child accidentally injured). See also Newton v. State, 127 Ga.App. 64, 65(1), 192 S.E.2d 526 (1972) (assumed simple battery was a lesser included offense; defendant denied allegations and testified injuries resulted from various accidents). In those cases, we have concluded that the charge was not required because the evidence showed either the completed offense or no offense. Smith, supra; Newton, supra. Here, no such argument was made. Dinkler admitted that he beat his children to discipline them.
[7] (Punctuation and footnote omitted.) Lumpkin v. State, 245 Ga.App. 627, 629, 538 S.E.2d 514 (2000).
[8] See Edwards, supra, (failure to give written requested charge was harmless error). See also Celestin v. State, 296 Ga.App. 727, 738(5), 675 S.E.2d 480 (2009) (same).
[9] See Leftwich v. State, 299 Ga.App. 392, 398(4), 682 S.E.2d 614 (2009).